# Duff *against* Bayard.

The owner of a vessel, such as is responsible for supplies or necessaries, furnished for her use by the orders of the master, is the person, who having some kind of claim or title, has the control and management of the vessel and the right to receive her freight and earnings and direct her destination. One who has the mere legal title, whether by bill of sale, mortgage or pledge, is not liable for debts contracted by the master for supplies.

ERROR to the District Court of *Allegheny* county.

Edward Duff against George A. Bayard, John Freeman, and Alexander Miller, trading under the firm of Freeman & Miller, and Thomas K. Litch and David Cinnamon, trading under the firm of Litch & Cinnamon, owners of the steamboat " General

[Duff v. Bayard.]

Brady." This was an action on the case in *assumpsit* to recover the amount of an account for supplies furnished for the steamboat "General Brady," and the only question in the cause was whether the defendants were such owners as made them liable for the supplies furnished by order of the captain.

It appeared that one Miller contracted with Noble & Bayard, who owned a saw-mill and lumber-yard, to furnish the lumber, and Messrs Anderson and others, boat-builders, to make the hull of this boat; that they proceeded to finish the hull; but as Miller did not return to furnish the funds, the work, so far as it proceeded, remained on their hands. In July 1838, captain Gonzales came and agreed to purchase the hull for the sum of $4000; the vendors were to complete the work, and if Gonzales had any alterations made, he was to pay for it as extra work. He paid some money down, ($300), took possession of the boat, and hired a hand to take care of her, till he should return to St. Louis or Alton, and get money from his employers to finish the boat and put an engine in her. Shortly before he returned, on the 6th or 7th of November, a storm of wind sank the boat as she lay at the shore. Amberson and Bayard, when they heard of this, and the person left in charge of her was doing nothing to raise her up, sent their hands to raise her up; and when this was nearly effected, an agent of Gonzales arrived, and soon after, Gonzales himself, who agreed to pay for the trouble of raising her. It appeared that several other persons, living some in St. Louis and some in Alton, were partners with Gonzales in the purchase; one of them, E. P. Wells, came on and joined Gonzales in getting the boat finished. Gonzales was to be captain and Wells clerk; they were both partners in the purchase. Mr Beelen was made their money agent, and some $2500 or $3000 were put in his hands. Gonzales contracted with Litch & Cinnamon for an engine, for which he was to pay some $7000 or $8000. How much money he paid did not appear, but he gave them drafts for $6900 on the partners, which were receipted as payment if accepted and paid. Bayard was paid his bill of $2659 in the same way; but these drafts had from four to ten months to run. The plaintiff, having a large bill, took a draft on St. Louis for his pay. The cash in Mr Beelen's hands was exhausted, and still numerous small debts were unpaid.

The plaintiff called a number of witnesses to prove the payment of small bills by the defendants for work done for the boat before she went out of port; he also produced the custom-house book, and exhibited the following entry:—"1839, 12th March, Enrolment No. 58. George A. Bayard, Thomas K. Litch, David Cinnamon, John Freeman, and Alexander Miller, owners of the steamboat 'General Brady;' oath made by James Gonzales."

The defendants, for the purpose of rebutting the inferences to be drawn from the evidence of the plaintiff, and showing that they were never owners of the boat, but that the acts done by them

IV. — 31　　　　v

were for the purpose of securing the large debts due to them, gave in evidence the deposition of Edwin R. Wells, as follows:

"Sometime in September 1838, Dr Lathey informed me that he had an idea of investing money in a steamboat with Gonzales, which boat was building at Pittsburgh. About the 1st of October following, he concluded an arrangement with Gonzales to take an interest in his boat, and gave him drafts to the amount of $5000. This took place in my own knowledge; I was doing business for Dr Lathey at the time. Gonzales came on to Pittsburgh about October, immediately after receiving the drafts, with the under-standing that he would have the boat round there, at Alton, Illi-nois, sometime in November or December following. Sometime about the latter end of January following, a man by name of Cruse came on to Alton from Pittsburgh with letters from Gon-zales, stating that he must have some $5000 more money to finish out the boat, which was not yet completed, authorizing Lathey to dispose of an interest in the boat, if it were not convenient for him to do so himself. It not being convenient for Lathey to raise the money, he made an arrangement with Messrs Hawley & Dunlap and myself to take an interest in the boat and advance the money. Accordingly I came on to Pittsburgh with money and drafts at sight to amount of $5000. I arrived in Pittsburgh on or near the 20th of February 1839. I brought with me an estimated cost of the boat, to guide me in my investments, which made the cost of the boat some $16,500; and after examining some two or three days and getting all the information I could, the boat not yet com-pleted, I found that my information corresponded so near with my estimate that I ventured to invest; being limited in my instruc-tions, by and for Messrs Hawley & Dunlap, to some $17,000 or 17,500, for them. My examinations and conclusions were drawn from the principal contracts that were made for the boat previous, viz: the hull, engine, joiners' work and painting; which all did not vary from the original estimate which I was guided by more than $500, more or less. I accordingly invested, and paid over money, together with a draft at sight for $500, which was paid into Mr Beelen's hands, a sum little short of $3000, and took his receipt as Gonzales' agent of the boat, in my own and Messrs Hawley & Dunlap's names, one-half on my own account, and one-half on account of Hawley & Dunlap, as so much money advanced for stock in the boat, which had not as yet received a name, but which was afterwards called the 'General Brady.' Previous to paying over this money, I made an agreement in writing with James Gonzales, distributing the stock of the boat, stating the proportions and amount that each one was to hold of said boat. Which paper is in the handwriting of Mr Hogan, Beelen's clerk."

"The stockholders' names were H. K. Lathey, Thomas G. Haw-ley, Robert Dunlap, James Gonzales, John George, and myself. H. K. Lathey's stock was to be $5000; Hawley & Dunlap's, one

[Duff v. Bayard.]

third of the boat; myself $3500; James Gonzales and John George were to have the balance of the boat, in such proportion as they would themselves agree—George being a nephew of Gonzales. The above disposition of the boat was made on the supposition that the boat would not cost above $17,000 or $17,500. The agreement mentioned then also provided for the payment of drafts drawn for the benefit of each of the stockholders, in this way—that in case any one should fail to meet so much of the drafts as fell to his share to pay, the others had the power to sell so much of his interest in the boat as would meet such failure. The boat was completed on or about the middle of March 1839. We left Pittsburgh with her on Sunday, 17th of same month. I think it was on Tuesday previous that captain Gonzales told me that Litch, Cinnamon & Co. wanted security on the drafts they held as payments towards the boat. I told him that I was willing they should have security, which was given them by taking out the custom-house papers in their names, and which was done on Friday the 15th, (if I recollect right), before the boat left; they, viz: Litch, Cinnamon & Co. and George A. Bayard, having no interest in profits or losses of the boat whatever, farther than any damage the boat might sustain by tear and wear or otherwise, which might prejudice their security. The boat was run for and on account of, and at the risk of H. K. Lathey, Thomas G. Hawley, Robert Dunlap, James Gonzales, John George, and myself, who were the whole and only owners of the said boat.

"Most of the business of the boat being settled upon the 16th, the day before we left, it was impossible to ascertain the exact cost of the boat before we left; and when I had time to add the bills all up, when under way, I found the boat had cost a little short, if I recollect right, of $21,000—it was upwards of $20,000. I made up my stock account on the books of the boat, in the names of H. K. Lathey, Thomas G. Hawley, R. Dunlap, James Gonzales, John George, and myself, for the amounts and proportions mentioned in the agreement beforementioned.

"I appropriated the stock to those owners agreeably to the proportion before stated, depending that Hawley & Dunlap would either take their proportion, although it exceeded their instructions to me, or that should they not do so, that Dr Lathey would himself take it, as he had before told me. Understanding before I left Alton, that Mr Beelen was a man of great business and influence in controlling freight in the direction we were going, I was advised to continue him as agent, he already acting as Gonzales' agent, and on my arrival here I was induced to do so; and when I paid over my moneys to him into his hands, I was assured by him I would have enough to take out the boat. About Friday before the boat left, I was astonished to find that I had no money in his hands, when I thought there were more funds in his hands than would pay some small bills which I wanted to pay, to amount of about

[Duff v. Bayard.]

$700; Mr Beelen having appropriated my money to pay furniture bills, on which I expected we were to have six months' credit, and Mr Beelen refused to render me any assistance in accommodating these small bills even on time. I accordingly made an arrangement with Litch, Cinnamon & Co. to accept sundry small drafts at four months: the number or amounts of said drafts I do not recollect, but among the names in whose favour I drew were the following: O'Leary, Mulvany & Co., George Vandegrift, Gallagher, (brass-founder), J. T. Morgan, Hillier & Co.; they also paid money for me to Mrs Savage and Mrs Connelly, the last for boarding, and Mrs Savage for sewing, and also in cash lent me to take out the boat, $100, and for which $100 I gave them a note, pledging myself to them to remit out of the first earnings of the boat, the money they had advanced for me, and to me, and also to remit to them the amount of the several drafts they had accepted for me, previously to their falling due. At the custom-house, there were present James Gonzales, Thomas K. Litch, and myself; there was no conversation took place there that I recollect, more than the affidavit which was made by James Gonzales, that I recollect of. I acted as the agent of Lathey, Hawley & Dunlap, and myself, after arriving here, and while here before she went out, and while on the boat, so long as I remained on her. There was no delivery of the boat to those gentlemen, nor no taking possession by them. The papers were taken out in their names, and nothing said about delivery of the boat to them, either at the custom-house or afterwards, and I had good opportunity to hear all that was going on. From the time I took out the boat, and before, and while I was on board, I acted as the agent of the owners abovenamed, and I drew drafts on Lathey and Messrs Hawley & Dunlap as owners of the boat, after the papers had been taken out of the custom-house. I never held out the name or names of any person or persons as owners, other than the persons I have above named as the owners; and neither of the defendants here did at any time attempt or offer to control the destination of the boat. Some of the drafts were made at 4 months, and some at 6 months. Dr Lathey and Hawley & Dunlap at that time resided at Alton, when the drafts were drawn on them; and at their maturity I received a notice of protest for non-payment at Alton, as the drawer of said drafts. The drafts on Dr Lathey were accepted, but those drawn on Hawley & Dunlap were not accepted."

The plaintiff requested the court to charge the jury upon the following points:

1. If they believe that by the terms of the contract for the purchase of the boat in question, between the defendants and Gonzales, acting for Dr Lathey and others, the property in said boat, originally in defendants, was not to be changed till the money was paid or security given therefor, and the money not being paid nor security given therefor when the boat was finished and ready to

[Duff v. Bayard.]

leave the wharf, an agreement was made between the said defendants and Gonzales, acting for Dr Lathey and others, by which Gonzales, the captain, was to hold the boat for the said defendants till they should be paid for it, and the boat under this agreement left the wharf and went upon her voyage, then there was no change of property in the said boat, and the defendants are liable, as owners thereof, to the plaintiff.

2. If the contract on the part of the defendants with Gonzales, acting for Dr Lathey and others, was for the sale of the boat in question before it was built or completed, it was an executory contract. If by its terms the boat was not to leave the wharf till it was paid for or security given therefor, and the parties thereto, upon the boat being ready for delivery at the wharf, and the same not being paid for nor security given therefor, enter into an agreement by which the said Gonzales was to hold the said boat for the said defendants till they should be paid therefor, and under this agreement the said boat left the wharf and proceeded on her voyage, then the legal effect of such agreement was to keep the said executory contract open and allow further time for its performance; the property in said boat therefore remained in the said defendants after such agreement, and the boat's leaving the wharf under it, and they are liable, as the owners thereof, to the plaintiff.

3. That the enrolment of the boat in the names of the defendants, on the custom-house book, is strong evidence of their being the owners of it, and in the absence of counteracting proof, decisive of the fact.

4. That whether the defendants were owners of the boat at the time the articles enumerated and specified in the plaintiff's account were furnished by him for it, is a question of fact for the jury to decide.

GRIER, President, after reviewing all the facts of the case and expressing a very strong opinion against the plaintiff's right to recover, thus concluded his charge to the jury and his answers to the points put to the court by the plaintiff:—

Finally, if you believe that the testimony of the witnesses is not true, but that the defendants were the owners of the boat all the time; that all this sale given in evidence by plaintiff himself to Gonzales, was all a farce; that the taking of these bills by defendant on the western owners, and the whole transaction in evidence before you, is a mere lie, and that the defendants were owners all the time; and Gonzales & Wells, instead of being partners of Lathey and others, and agents for them, were the agents of defendants, your verdict should be for plaintiff for the whole amount of his claim. Or if you believe that the transaction, at the time of the registry, was not a mortgage or security, as testified to you, and that the vessel was navigated, freighted and used till she was sold in St. Louis, for the defendants' use and at their risk (directly

IV. — V *

[Duff v. Bayard.]

contrary to all the testimony in the case), you will find for the plaintiff so much as was furnished after they became such owners and in possession, provided you have proof it was ordered by them or by any agent of theirs, or on their credit. But if you believe the testimony before you, which is uncontradicted, both as to the sale to Gonzales and others, and the mortgage and registry, and that the boat was navigated by the mortgagors, and at their expense and risk, as is shown by all the testimony before you, you will find for the defendants. I see no contradiction in the testimony; its credibility is for you; but you have no right to imagine facts contrary to the testimony, and if the witnesses are believed on both sides where they are uncontradicted, the plaintiff has not shown a case which in law will entitle him to recover. It may be a hard case for plaintiff to lose his money, but it is a very common one, and it does not follow that the plaintiff may remunerate himself by plundering the defendants, whose joint loss is, probably, ten times greater than plaintiff's.

The plaintiff has presented certain instructions, which we are requested to give to the jury in this case. Without, at present, deciding how far the plaintiff has a right to call upon the court to instruct you upon the supposition that the jury will believe and act upon a hypothetical statement of facts, directly contrary to the testimony advanced by the plaintiff himself, it is proper to state, that plaintiff himself has shown that the present defendants were not the owners of the hull of the vessel at the time of the contract with Gonzales, but that Noble & Co. and Amberson & Co. had constructed it, and were the owners; and that Freeman, Miller, Litch & Cinnamon, four of the present defendants who made the engine for the boat, never had any pretence of ownership in the boat till the transaction of the enrolment, on the subject of which we have fully instructed the jury already. The plaintiff has proved also, that Noble & Co. acting for themselves and Amberson & Co. sold the hull to Gonzales for $4000, received $300 in hand, delivered the boat to Gonzales, who put a man in possession of her to take care of her, and that the contract was, that the boat was not to leave the wharf till paid for, or security given for the price of her. Whether these vendors under such a contract retained any lien on the boat after they gave up the possession, is not worth while to inquire, as it has no bearing on this case. A contract of sale is usually complete by the delivery to the vendee. But even if there were any foundation in the testimony, for the hypothesis presented in this point, the legal consequence claimed to arise from it would not necessarily follow, to wit: that defendants are liable to pay the plaintiff, if the other undisputed facts in evidence in the case are not entirely left out of view; nor unless the jury have sufficient evidence to satisfy them that the plaintiff's bill for liquor, groceries and other stores, were furnished at the request or on the credit of the defendants.

[Duff v. Bayard.]

If Gonzales was defendants' agent, and had a right to bind them by his acts, and undertook to bind them, the jury should make them liable, but not otherwise. There are no peculiar mystical legal principles connected with steamboats, that make contracts concerning them differ from other similar chattels, that it necessarily follows, if the jury by some fanciful process of reasoning, may be led to suppose the defendants may, by some figure of speech, or nice construction of language, be called owners, that therefore as a logical or legal consequence, they must be liable for every gallon of liquor or pound of candles furnished to every person employed about her.

If I should sell one of you the running gears of a wagon, and, on payment of part of the money, deliver it to you, contracting with you that you should not take the wagon out of Pittsburgh till you paid the balance or gave me good security, and you afterwards employed a man on your own credit to paint the wagon, and make a bed, &c. for it, the persons who did this work for you would have no claim against me for compensation, if I gave you no power to act for me, if you made no pretence to it, and the work was not done on my credit; and if afterwards I took a pledge of, or mortgage on the wagon for my debt, it would not necessarily follow that I became paymaster to the men you employed to paint it, &c. And if after your wagon was finished you put your horses in it and sent your wagoner to Philadelphia, to carry goods for you, I would not be liable to the tavern-keepers for the oats and whiskey furnished your horses and driver, merely on proof, that by way of retaining a security for my debt, I had agreed with you that the wagon should be considered mine till the debt was paid. There might be some question whether my lien would be good for anything as against your creditors, but there would be no question about my liability for provisions furnished to your servant or horses not on my credit nor at my request; and if I were sued for such provisions, I cannot see that the consequence of my liability would necessarily follow, even if the jury might think I had a good legal title to the wagon. I may hire my horses and wagon to another, and I will not necessarily be liable for supplies furnished his servants, because I am owner of the wagon. Whether the master or clerk (who is, in this country, more often the general agent of a steamboat) would have all the powers to bind the owners, that masters of vessels at sea have by the maritime law, such as to bind the vessel by bottomry bonds, &c., it is not worth while now to inquire. I doubt not, that by common law, they would be presumed to have the power, as the general agents of the owners or freighters, to bind them for repairs, or necessary provisions furnished the boat; but mortgagees, or mere legal owners of a boat, although she may be registered in their name, are not liable for provisions furnished to the hands or servants of the mortgagors, or persons who may have chartered

[Duff v. Bayard.]

a vessel and are navigating her for their own profits and at their own risk; and for this reason, that the master is not the agent of the nominal or legal owner, and has no power to bind him.

2. What I have said in answer to the first point, will also apply to the second, which is framed partly on the same hypothesis of facts not at all in evidence, and attempts to vary the case only by calling it an executory contract.  Giving it a new name, will not alter the case, or make the defendants liable for provisions furnished to other men's servants, on other men's credit, and at the request of other men's agents.  You may call this transaction, by which the defendants (unsuccessfully) endeavoured to retain a lien for their debts on this steamboat, "ownership," "executory contract," or any other name in the whole legal vocabulary — names cannot alter things — defendants cannot be liable for debts they never contracted, and unless the jury have some evidence to show that Gonzales & Wells had some authority from defendants, or were acting as their agents or servants, and not as the agents of Lathey and others, the defendants are not liable.

3. As to the value of the enrolment, I have already instructed you.

4. It is true, that it is a question of fact for the jury; but the jury must decide the facts from the evidence, and remember that even if plaintiff should lose the debt if not recovered in this suit, it does not follow that defendants should be plundered because they are rich and able to pay the plaintiff, or because he is poor, without any regard to law or fact.  The jury will apply the principles of law, as stated by the court, to the facts as they are in evidence before them, and find a verdict accordingly.

Errors assigned:

1. The court below erred in their answer to the points made by the plaintiff.

2. In not answering the points made by plaintiff as requested.

3. The facts were taken from the jury, and the whole case decided by the court.

*M'Candless* and *Findlay,* for plaintiff in error, contended that, admitting the facts as contended for by the defendants, their design was to hold this boat in their possession as security for their debt, they were mortgagees in possession, and their possession was for the purpose of paying their debt, and therefore, by the widest construction of which the case will admit, inasmuch as the payment of their debt depended upon the safety and success of the enterprise in which she was about to embark, they were such owners as were chargeable with the expenses of the outfit.  The captain of the boat was their agent, and bound to return the vessel to them as their security.  If this were not so, then the pledge of it to them was nothing.  But even if such pledge was a nullity as to creditors, it was binding upon the parties to it, of whom the defendants

[Duff v. Bayard.]

were one. That the defendants were liable under such circumstances, see 7 *Term Rep.* 312; 16 *Eng. Com. L. Rep.* 432; 15 *Mass.* 449. But we complain that the court gave a binding direction to the jury with regard to the facts of the case, which was erroneous. 2 *Serg. & Rawle* 415; 8 *Serg. & Rawle* 333; 4 *Rawle* 356.

*Burke* and *Biddle, contra.* It is so perfectly clear as not to admit of argument, that the boat was in point of fact at no time in the possession of the defendants, nor for a moment under their control, either as to her destination or employment, or the proceeds of it; and this fact once established, the law is well settled that the defendants are not liable. A mere legal ownership, without possession, creates no liability; for the question is, to whom was the credit given? to the mere legal owner or perhaps mortgagee, or to the person who has the actual possession of the vessel and is interested in her voyage? That it is the latter they cited 7 *Johns.* 307; 8 *Johns.* 159; 15 *Johns.* 298; 14 *Johns.* 201; 2 *Taunt.* 5; 14 *Eng. Com. Law* 378; 21 *Eng. Com. Law* 378; 7 *Cowen* 697; 2 *Hall* 121; 8 *Johns.* 272; 6 *Greenleaf* 474; 1 *Wash. C. C.* 226; 8 *Serg. & Rawle* 123; 2 *Watts* 117.

The opinion of the Court was delivered by

SERGEANT, J.—That the owners of a vessel are liable for supplies or necessaries furnished for her use by the orders of the master, where no other person has been expressly credited, is a principle long established. But who is such owner in any given case, is a question on which there are to be found contradictory cases and fluctuating opinions in the reports. The later decisions seem however to agree that one having the legal title only, without any interference in the management of the ship, or any right to receive her freight or earnings, is not responsible: whether the title is by a bill of sale or other sufficient conveyance, or whether it is by mortgage or other document in the nature of a pledge or security. Such persons are, it is true, in one sense, owners—that is to say, they have a valid claim or title to the property of the vessel, either in law or equity. But that is not sufficient. The owner who is responsible in such cases is the person who, having some kind of claim or title, has the control and management of the vessel, and has the right to receive her freight and earnings. And the ground of this liability seems to be the common maxim, *qui sentit commodum sentire debet et onus:* it being obviously right and just that he who enjoys the benefits of the vessel, and controls her operations, who receives her gains or has the chance of so doing, ought to pay debts incurred for the fitting out, supply, and navigation of the vessel which is to produce for him those earnings, and not a person who merely holds a right in her without the

IV.—32

[Duff v. Bayard.]

profit or usufruct. It is for the former of these and not for the latter, that the master is considered as agent, and competent to bind them by his orders for supplies furnished to the vessel.

In the case before us, the supplies were furnished to the vessel by the orders of the captain, Gonzales, and charged to the owners by the plaintiff. There is nothing in the evidence to show that the defendants were owners in the legal sense of the word; that is to say, that they appointed the captain, controlled the navigation or destination of the vessel on her voyage, or were entitled to receive or did receive any portion of her freight or earnings. They being creditors themselves, who had furnished materials and work for the building of the boat, took a mortgage of her for their security; and it must be a strong case, to make them not only lose their own debts, but in addition, to be responsible to other creditors. It is urged by the plaintiff that Wells, the defendant's witness, states, in one of his depositions, that the defendants were to have possession, and Gonzales was to be their captain. It, however, appears that this possession was but nominal—evidently with a view to evade the rule of law that a mortgage or transfer of personal property, unless accompanied and followed by possession, is a fraud on creditors, and therefore voidable by them. Certain it is, on the evidence, that there was no actual *bonâ fide* possession given. The defendants did not appoint the captain or clerk; they did not direct the navigation or destination of the boat; nor were they to receive the profits or earnings of her voyage. These all remained with Wells, Lathey, and their partners, who had purchased her, and held and navigated her from this port. The defendants had in fact no more to rely on than their mortgage, fortified by the registry in their names, which it has been frequently decided is of no avail in itself, more than any other mere title, to make them liable, as owners, to third persons; being efficacious only so far as relates to the government, or so far as, in a dispute among themselves, it might be useful to show their interest. It may be added that the same principle operates in real estate. The owner of land is he who has a right to receive the income and profits, and may enjoy the beneficial interest; and such person is liable as assignee for the rents reserved in a former conveyance, though the legal title under an absolute deed, exists in another person. *Berry* v. *M'Mullen*, (17 *Serg. & Rawle* 84).

Judgment affirmed.