## THE SAMUEL MARSHALL.

### PITTMAN et al. v. THE SAMUEL MARSHALL.

(Circuit Court of Appeals, Sixth Circuit. February 6, 1893.)

#### No. 38.

1. MARITIME LIENS—SUPPLIES—HOME PORT OF A VESSEL.
Under the general maritime law, one who furnishes supplies to a vessel has a right to suppose her home port to be that where she is enrolled, and therefore that which is painted on her stern; but where she is chartered by her owners, the charterer to have full control, and to employ and discharge her officers and men, with the obligation of paying all running expenses, her home port, for the purpose of determining whether the supply man's lien attaches, is the port of the charterer, provided the supply man has knowledge of the facts, or sufficient notice to put him on inquiry. 49 Fed. Rep. 754, affirmed.

2. SAME—NOTICE OF CHARTER—AGENT'S AUTHORITY.
An employe in charge of a coal dock in the Detroit river had authority to furnish coal to any steamer calling for it, and to either receive cash, or take a receipt from the master, and get the name of the person who would pay the bill. He was then to take a memorandum of all these facts, and at once notify his employers. Demand for payment was always made personally or by mail, but the coal was always charged on the books against the steamer to which it was furnished. *Held*, that the employe was clothed with apparent authority to sell on credit, and so to receive notice of any limitation of the vessel's liability, and that the supply man, under the general maritime law, could not hold the vessel liable, when the master notified the employe that she was chartered by a citizen of the same state as the supply man.

3. SAME—SUPPLIES FURNISHED ON CREDIT OF THE VESSEL—EVIDENCE.
Certain merchants furnished coal to a steamer for a part of two seasons, receiving payment, from time to time, from a company not the owner. They had furnished coal to other vessels, and received payment from the same company, and in previous seasons had furnished coal to the same master, then in charge of another vessel, and been paid by the same company, which was well known, and of good financial standing. Its principal business office was directly across the street from the supply man's office, and it was engaged in business requiring it to charter vessels. The supply man had twice received its acceptances for coal furnished to this vessel, though it was charged on the supply man's books to the credit of the vessel. *Held*, that the supply man had notice that the company had chartered the vessel, or of facts sufficient to put him on inquiry; and that the coal was furnished on the credit of the charterer, and not of the vessel.

4. SAME.
The lien on a vessel given by a state statute (How. Ann. St. Mich. § 8236) for all debts contracted for by the owner or master on account of supplies furnished is maritime in its nature, because the contract out of which it springs is maritime, and as such it is subject to the limitations of the general maritime law. It therefore does not attach unless the supplies were furnished on the credit of the vessel. 49 Fed. Rep. 754, affirmed. The Young Mechanic, 2 Curt. 404, applied. The Illinois White and Cheek, 2 Flip. 383, disapproved.

Appeal from the District Court of the United States for the Eastern District of Michigan.

In Admiralty. Libel by James E. Pittman and others against the steam barge Samuel Marshall (Edward Smith and others, claimants) for supplies. The district court dismissed the libel. 49 Fed. Rep. 754. Libelants appeal. Affirmed.

Bowen, Douglas & Whiting, for appellants.

John C. Shaw and Herbert A. Wright, for appellees.

Before JACKSON and TAFT, Circuit Judges, and SAGE, District Judge.

TAFT, Circuit Judge. This is an appeal from a decree of the district court for the eastern district of Michigan in admiralty, dismissing a libel against the steam barge Samuel Marshall. The libelants were a firm of coal merchants doing business in Detroit, Mich. The Samuel Marshall was a steam barge enrolled at Buffalo, N. Y. The libel alleged that she was a foreign vessel, wholly owned by persons residing at Buffalo; that at the several times during the year 1890, mentioned in the schedule of coal deliveries attached to the libel, while the vessel was lying at the port of Detroit, the master represented that the vessel stood in need of supplies and fuel to render her seaworthy and able to proceed on her voyages or trips, and requested the libelants to furnish the same, which the libelants did; that the libelants, in doing so, relied upon the credit of the vessel, as well as upon that of the master and owners thereof, and would not have furnished the supplies and fuel except upon the credit of the vessel. The claim is for $1,193.11, with interest from the 1st day of November, 1890. The defense was that the vessel was under charter by the J. E. Potts Salt & Lumber Company, a corporation organized under the laws of and doing business in the state of Michigan, with its principal office at the city of Detroit; that the company was bound under the charter to furnish all supplies and fuel which it should need or desire on said vessel; and that the fuel and supplies furnished were not, and could not be, for the benefit of the vessel, or the actual owners thereof,—all of which was well known to libelants when the coal was furnished. Subsequently an amended libel was filed in which the claim for the lien was based, not only on the general maritime law, but also upon the laws of the state of Michigan conferring a lien for supplies furnished to boats navigating the waters of the state. The evidence shows that the libelants owned and used a dock on the Detroit river, at which they were in the habit of supplying coal to steamers. The dock was in charge of one McDonald, an employe of libelants, who was given authority to furnish coal for any steamer that called for it, and to receive the cash if tendered. If cash was not paid, then it was his duty to take a receipt for the coal from the master, and to get from him the name of the individual or company who would pay the bill. McDonald entered upon a memorandum book all these facts, and at once gave notice of them to the libelants, whose principal office was some distance from the dock. Demand for payment was made either by

the local collector of the firm or by mail, as the person named by the master was a resident or nonresident of Detroit. The coal delivered on credit was always charged on the books of the libelants against the steamer to and for which it was furnished.

The steamer Samuel Marshall was chartered for the season of 1889 by the Potts Salt & Lumber Company, a corporation of the state of Michigan, with its principal office in Detroit. Under the charter the Potts Company was given possession of the vessel, and authority, at its own expense, to victual, man, and navigate her, to hire a master agreeable to the owners, to exercise entire and sole control and direction over him, to summarily discharge him for disobedience of orders, and employ another to be approved by the owners. The master was given power to hire and discharge the other officers and the crew. The Potts Company bound itself to furnish the master with funds sufficient to pay all running and partial loss expense of the vessel. The charter was renewed for the season of 1890. The Potts Company did a most extensive business in carrying salt and lumber on the lakes, and had several vessels under charter. The master of the Marshall in 1890 had been in 1888 and 1889 master of the Colwell, another vessel chartered by the Potts Company, and had during those seasons procured his monthly supplies of coal from libelants, who collected the bills from the Potts Company. As master of the Marshall he had obtained monthly supplies of coal from libelants from April until September, 1890, and the Potts Company had paid for them. The company had other vessels under charter in 1890 whose coal bills with libelants it also paid. The principal office of the Potts Company was immediately opposite that of libelants, on the same street, in Detroit. It was a well-known company, with very large interests, and up to November 24, 1890, had good financial standing. In July, 1890, before the coal was delivered for which this libel was filed, the master of the Marshall told McDonald, libelants' dock man, that his vessel was under charter by the Potts Company. In September, when payment was demanded of the Potts Company for the coal delivered to the Marshall in the previous month, the collector was tendered an acceptance of the company for the amount. He telephoned his principals to know what he should do, and was directed to receive the acceptance, and receipt the bill, which he did. In November of the same year, on the presentation of another bill for additional coal delivered to the Marshall, and including also coal delivered to another vessel chartered by the Potts Company, a second acceptance was received by the collector, this time without special authority from libelants. The second acceptance was, however, delivered by their collector to libelants, and deposited by them in their cash drawer. On November 24, 1890, the Potts Company made an assignment for the benefit of creditors, and on the next day, before the second acceptance was due, the libel in this case was filed.

The questions in the case are two: First. Did the libelants obtain a lien for the coal furnished to the steamer Marshall under the general maritime law? Second. If they did not, then are they entitled to a lien under the state law of Michigan? Judge

Severens, in the court below, held, in a satisfactory and convincing opinion, that they had no lien in either aspect of the case, and we entirely concur with him in that view.

Under the general maritime law, any one furnishing necessary supplies or material to a vessel in a foreign port, on the order of its master, and on the credit of the vessel, has a lien thereon, entitling him to proceed against the vessel in rem, and have her sold to pay his claim. Such a lien is not given when the supplies are furnished to a vessel in her home port, because it is then supposed that they are furnished on the credit of the owner. The home port of the vessel is the port of the country where her owner lives. In The General Smith, 4 Wheat. 443, it was held by the supreme court that vessels having their home port in one state of the United States are to be regarded, in the application of the foregoing rules, as foreign vessels, in the port of another state. One of the owners of the Marshall lived in Michigan, and the other three in New York. The vessel, as has been stated, was enrolled at Buffalo, and carried that as her hail port upon her stern. When a material or supply man furnishes supplies to a vessel without other knowledge of her, he has a right to suppose that her owners live in the state of the port where she is enrolled, and that, therefore, her home port is that which is painted on her stern. When a vessel is chartered by her owners so that the charterers are to have full control of the vessel, and to employ and discharge her officers and men, with the obligation of paying all her running expenses, then the charterer becomes the owner pro hac vice; and the home port of a vessel, for the purpose of determining whether a lien attaches, is the port of the charterer, and not the port of the actual owners, provided that the supply or material man has knowledge of the change of ownership, or has notice of facts putting him on inquiry with reference thereto. The Golden Gate, 1 Newb. Adm. 308; Beinecke v. The Secret, 3 Fed. Rep. 665; The Norman, 6 Fed. Rep. 406; The Secret, 15 Fed. Rep. 480; Stephenson v. The Francis, 21 Fed. Rep. 715.

The first important inquiry in this case, in view of these principles of the admiralty law, is whether notice was brought home to the libelants that the Samuel Marshall was under charter to the Potts Company. The libelants deny all knowledge of the fact. The master of the Marshall says he told McDonald that the Marshall was chartered by the Potts Company. McDonald was not called as a witness by libelants, and his absence is not accounted for. It must, therefore, be taken as a fact that McDonald knew that the Marshall was chartered by the Potts Company. It is vigorously urged, however, that McDonald had no authority to receive notice of such a fact. His orders were to deliver coal to any steamer whose master requested it,—if cash was paid, to receive it; if not, to take the name of the person from whom collection should be made. It is said that he had no discretion to pass on credits. The question is of apparent authority. If the libelants gave McDonald orders to deliver coal at request to any steamer without receiving cash, then they have clothed him with apparent authority to sell on credit, and so to receive notice of any limitation upon the liability of the

vessel. Otherwise the libelants would have power to sell coal to a master, and hold the vessel, though the master should expressly say to McDonald that, if the coal was delivered to him, the vessel could not be held for it. They cannot, by limitations on the seeming authority of an agent, be permitted to mislead third persons to change their position. It is to be presumed that, if the master of the Marshall knew that, no matter what he said to McDonald, his vessel would be held by the libelants for the supplies, he would have gone elsewhere to get them.

But the libelants' knowledge of the charter does not rest on McDonald's information alone. They knew that the Potts Company had paid for the monthly supplies of the Marshall during that season of 1890, and for some part of 1889. They knew that the company was doing a most extensive business, in which it was necessary for it to charter steamers. They knew that, for two seasons before and during the season of 1890, the company had paid for the monthly supplies of other steamers. They could reasonably infer from this knowledge that not only was the Marshall chartered by the Potts Company, but also that it was bound to furnish the supplies. The denial by the libelants that they knew of the charter and its provisions was doubtless based on the absence of any direct and positive information in regard to it, rather than upon ignorance of facts from which its existence and effect could be reasonably inferred. They were certainly put upon inquiry as to whether the Potts Company was running the vessel, and paying for its supplies. In other words, they were put upon notice that the Potts Company was pro hac vice the owner of the Marshall. That being the case, the home port of the Marshall, for the purposes of this discussion, was Detroit, and no lien under the general maritime law can be allowed for supplies furnished in that port.

The second question is whether, under the statute of Michigan, the libelants are entitled to a lien on the vessel. That statute provides (How. Ann. St. § 8236) "that every water craft above five tons burthen used or intended to be used in navigating the waters of this state shall be subject to a lien thereon, first, for all debts contracted by the owner or part owner, master, clerk, agent, steward, of such craft on acount of supplies and provisions furnished for the use of such water craft." It is contended on behalf of the libelants that this gives any material or supply man furnishing a vessel, at the request of its master, with materials or supplies, an absolute right to a lien on the vessel, without regard to the question whether credit was given to the vessel by the material or supply man, and without regard to the question whether the master had authority to purchase the supplies and hypothecate his vessel therefor. The language of the statute is broad enough to warrant the construction placed upon it by counsel for the libelants, but we do not think the construction is a correct one. The supreme court of the United States has decided that it is within the power of a state legislature to make by statute a lien on vessels, which the courts of the United States will enforce in their admiralty jurisdiction. The Lottawanna, 21 Wall. 579. It also decided that the jurisdiction of the United

States courts in admiralty is exclusive, and that no state court can enforce such a lien against a vessel in rem. The United States courts do not adopt the statute in all respects, but they enforce the lien therein given as a part of the local maritime law, which, as courts of admiralty, they may administer. As is well said by the learned judge below:

"It is because the contract for supplies is maritime that the court has and exercises its jurisdiction in enforcing the lien given for its security. The court does not have jurisdiction of it as an independent thing, that is to say, dissociated from the contract. The lien is an incident to the debt, and is inseparably connected with it, reflecting its qualities."

Into such a statute, therefore, must be imported the limitations which are always applicable to liens of this general class under the admiralty laws. This result would follow, whatever was the intention of the state legislature in passing the lien law. But it is clear that no intention is to be presumed on the part of the state legislature to avoid the limitations of the maritime law in the enforcement of the liens created by it, except the limitation as to the foreign character of the vessel. The lien given is jus in re, differing in many respects from liens at common law. A lien at common law is generally maintained and kept alive either by possession of the res or by something equivalent thereto, which shall give notice to third persons of its existence, as by recording or registering it in a public office. An equitable lien has no force as against any one not having notice of its existence. A maritime lien, however, is preserved in the thing itself, without regard to notice to third persons, whether bona fide purchasers or not. This is a peculiarity of the maritime lien which characterizes no liens in any other branch of the law. See the opinion of Mr. Justice Curtis in The Young Mechanic, 2 Curt. 404. In coming to construe a statute conferring a lien upon a vessel, therefore, the question naturally arises, shall the lien conferred by the statute be jus in re, so that its existence shall not be affected by sales, executions, or mortgages, or shall it be a lien good only against the owner on whose behalf supplies are furnished, and not good against any person acquiring an interest in the vessel without notice thereof? In the absence of any provision that such a lien shall be recorded for the information of the public and possible future purchasers, it would be reasonable, in construing the statute, if it is to be construed according to common-law principles, to hold that the lien be given no force against bona fide purchasers without notice. But this result would certainly not be in accord with the purpose of the legislature in creating such a lien. It is a well-known fact in the history of admiralty law in this country, that, after the decision in The General Smith, 4 Wheat. 443, where it was held that a lien for supplies did not attach at the home port of the vessel, many of the states sought to obviate the apparent and perhaps real injustice to their citizens, growing out of the exception, by passing laws which should create a lien also at the home port. The character of the lien thus created was presumably intended to be such that a resident of the home port of the vessel would be put on an equality, in respect to the lien to be secured,

with the citizens of a foreign state. In other words, the state legislatures were providing a maritime lien, and intended that it should have the peculiar characteristics of a maritime lien, and should be jus in re, as distinguished from jus ad rem, a lien the existence of which depended neither upon the possession nor notice to the public. It would be unreasonable to hold, therefore, that when they were creating a maritime lien, the legislatures did not also intend that it should have all the other peculiar characteristics that maritime liens of that class had under the general admiralty law. It should be said that the same conclusion must be reached, without respect to the legislative intention, because courts of admiralty have no jurisdiction to enforce liens except as admiralty liens, i. e. under the limitations ordinarily attaching to such liens.

It follows from what we have said that, inasmuch as a maritime lien acquired on a ship at a foreign port, by furnishing supplies, is only secured where the credit is given to the vessel, there must be the same limitation upon similar liens, secured by virtue of local statutes. We are aware that Judge Hammond, in this circuit, in the case of The Illinois, White and Creek, in 2 Flip. 383, in an elaborate and interesting opinion, reached the conclusion that liens on a vessel in favor of a supply or material man created by statute did not have imposed upon them, when enforced in admiralty, the limitations of the general maritime law, and that the supply man need not show, when the statute did not require it, that the credit had been given the ship. After a careful examination of that opinion, in connection with later authorities, we are unable to give it our approval. In the case of The Young Mechanic, in 2 Curt. 404, Mr. Justice Curtis, after a learned examination into the origin of the maritime lien and the purpose of the local statutes giving a lien in the home port for supplies furnished, concludes that the intention of the legislatures must be presumed to be that a lien thus given shall have all the attributes and limitations of a lien under the admiralty law; and in this circuit Mr. Justice Matthews and Judge Baxter, in The Guiding Star, 18 Fed. Rep. 263, held that statutory liens, when enforced in admiralty, were to be regarded as of the same character as liens conferred under the general admiralty law. In the latter case the question was whether the priority between liens should be determined under the state statute, as that statute had been interpreted by the supreme court of the state, or whether they should have priority according to the general principles governing priorities of liens in admiralty law. Upon this question Mr. Justice Matthews spoke as follows, (page 268:)

"The rule of priority adopted in courts of common law, 'qui prior est tempore, potior est jure,' does not govern in admiralty causes, but often it is just the reverse; as it frequently happens in case of salvage, and of repairs and supplies, that the last liability. in point of time is the first in point of merit, as having served to preserve the very subject which supports the lien for all. So that, in enforcing the statutory lien in maritime causes, admiralty courts do not adopt the statute itself, or the construction placed upon it by the courts of common law or of equity, when they apply it. Everything required by the statute as a condition on which the lien arises and vests must, of course, be regarded by courts of admiralty, for they can only act in en-

forcing a lien when the statute has, according to its terms, conferred it; but, beyond that, the statute, as such, does not furnish the rule for governing the decision of the cause in admiralty as between conflicting claims and liens. The maritime law treats the lien, because conferred upon a maritime contract by the statute, as if it had been conferred by itself, and consequently on the same footing as all maritime liens, the order of payment between them being determinable upon its own principles. For this reason it ignores altogether liens given, even by the same statute, for contracts and liabilities not maritime in their character, such as those for labor and materials supplied in the construction of the vessel, and for material or supplies, whether in a foreign or the home port, furnished not on the credit of the vessel itself, and also liens given by the owner of the vessel, as in the case of mortgages. If the maritime quality of the contract was not imparted to the lien given to secure it by the statute, it would follow either that a court of admiralty could have no jurisdiction to enforce it at all, or else that, having such jurisdiction, it was bound to enforce all liens given by the statute, according to its terms, whether upon maritime or nonmaritime contracts and obligations. The other alternative, which is here adopted, is that the statutory lien given for maritime liabilities is, of itself, in the nature of a maritime lien, to be enforced as such in admiralty courts, according to their rules and practice, that quality being imparted to it by the maritime character of the contract and liability which it is given to secure."

It follows from these authorities that the courts of admiralty will not enforce a maritime lien against a vessel for supplies created by a state statute unless the supplies were furnished on the credit of the vessel, for that is indispensable to the existence of maritime liens of this class. This was clearly the opinion of Mr. Justice Bradley when, in discussing the effect of the restoration of the twelfth admiralty rule, as adopted in 1844, wherein the United States district courts were given power to enforce liens against vessels by proceedings in rem for supplies furnished in the home port, he said:

"Of course this modification of the rule cannot avail where no lien exists, but where one does exist, no matter by what law, it removes all obstacles to a proceeding in rem, if credit is given to the vessel."

The next question, then, is whether the supplies in this case were furnished on the credit of the vessel. The learned judge below found that the supplies were not furnished on the credit of the vessel, but on the credit of the Potts Company, and in this we agree with him. The fact that the supplies were charged against the vessel on the books of the libelants is evidence only of a self-serving practice, which has no particular weight in the determination of this question. As was suggested in the cases of Beinecke v. The Secret, 3 Fed. Rep. 665, 667; The Francis, 21 Fed. Rep. 722; The Suliote, 23 Fed. Rep. 919; and The Mary Morgan, 28 Fed. Rep. 196-201,—such practice is not infrequently followed in order that the person who furnishes the supplies may not deprive himself of the lien, if he otherwise is entitled to it. This coal had been furnished to the Marshall during the entire season. Coal had been furnished to two other vessels chartered by the Potts Company in the two previous seasons, and had always been paid for by the Potts Company. It is useless now for the libelants to claim that they did not know the business which the Potts Company was doing, and did not know that it had chartered this vessel, and was running it and paying for

its supplies. The Potts Company was a concern whose credit was excellent, and there was nothing in the circumstances which would lead the libelants to seek other security. It is quite possible that they may have thought they had a lien, no matter whom they trusted; but this was not giving credit to the vessel. Their subsequent course in regard to the payments is conclusive evidence that they were looking to the Potts Company for payment, and not to the vessel. They knew that the Potts Company was not the actual owner of the vessel, and yet they were willing to delay the payment of the bills for coal, and receipt them in full, when given the acceptances of the Potts Company. If they had credited the vessel, is it reasonable to suppose that they would have accepted the obligations of third persons delaying the time of payment? More than this, they had notice of facts from which they ought to have inferred that the charter under which the Potts Company was running this steamer required them to pay for the fuel used by it in the operation of the steamer, and that it had no power to hypothecate the steamer for the payment of such fuel. Having reason to believe this, therefore, is it likely that the libelants would credit the steamer, and thus subject it to a hypothecation by the master, when that was beyond his authority? We are not at liberty to suppose so, for a presumption of this kind would impute fraud, or something very like it, to the libelants. It is true that, under certain circumstances, the master of a vessel, under a charter, where the charterer is the owner pro hac vice, may hypothecate his vessel for supplies, contrary to the terms of the charter party, but this is where there is dire necessity to save the vessel, or to bring her home within the reach of the owners. No such case is here presented. This was the home port of the charterers. The necessity was only that of going on the voyages for which the vessel was chartered, and not to bring the vessel home to its owners, or to save it from injury or loss. We think that on neither ground can a lien for the coal furnished be asserted against the vessel. We are therefore not called upon to consider the question whether a lien against the vessel was waived by the libelants taking the acceptances of the Potts Company, and receipting in full therefor.

The decree of the court below is affirmed, with costs.