## THE TEMPLAR.

### BODE et al. v. THE TEMPLAR.

(District Court, N. D. California. December 28, 1893.)

#### No. 10,575.

1. MARITIME LIENS—STATE STATUTES—AUTHORITY OF MASTER AND PART OWNERS IN HOME PORT.

Where a state statute gives a lien on a vessel for repairs and supplies furnished in her home port, the same presumptions in favor of the master's authority to contract therefor on her credit arise as exist under the maritime law where repairs and supplies are furnished in a foreign port; and the same rule obtains as to the authority of part owners.

2. SAME—NOTICE—PENDENCY OF POSSESSORY SUIT.

The right to a lien given by a state statute to persons furnishing supplies or labor for repairs to a vessel, under contracts with her master and part owner, is not affected by the filing of a bill by other part owners for possession, after the contracts were made.

3. SAME.

The filing of a libel by part owners of a vessel for possession, or to restrain her leaving port until security is given for her return, which alleges her need of repairs, and a belief that, if she proceeds on her voyage, she may be condemned as unseaworthy, and excessive charges for repairs be imposed on libelants, is not notice that her master has no authority to contract on her credit for reasonable repairs and supplies in her home port, and does not prevent the acquirement of a lien therefor under a state statute. Code Civil Proc. Cal. § 813.

4. ADMIRALTY—DISTRIBUTION OF PROCEEDS OF VESSEL.

Where there are funds in the registry from the sale of a vessel in a possessory suit, the court has power to pay therefrom claims for repairs and supplies furnished to the vessel.

In Admiralty. Libel by M. W. Bode and others against the bark Templar for supplies and repairs. Decree for libelants.

A. P. Van Duzer, for libelants.
Andros & Frank, for respondent.

MORROW, District Judge. This is an action in rem against the bark Templar to recover for supplies furnished and repairs made upon the vessel in the port of San Francisco. The bark is an American vessel, and, at the time the libel was filed in the case, she was owned by residents of San Francisco. Prior to the filing of this libel, a disagreement arose between the owners as to her employment, and a libel of possession was filed by the part owners representing seven-sixteenths interest of the bark, alleging that the other part owners, holding the remaining nine-sixteenths interest, had constituted one Simon G. Benson (also a part owner) master of the bark, and that he was about to take her on a voyage to sea; that the bark was unseaworthy, and in need of considerable repairs, and was unfit to perform any voyage without such repairs, and libelants believed that, upon such voyage, said bark might be condemned as unseaworthy, and excessive charges for her repair be imposed upon the libelants. The libel prayed that the part owners holding the nine-sixteenths interest should be cited to show cause why Benson should not be restrained from proceeding to sea

with said bark until good and sufficient security had been given, to the amount of the value of the shares of the libelants, for the return of the vessel to the port of San Francisco. This last-mentioned libel was filed March 18, 1893, and, the majority owners not having furnished a bond for the possession of the vessel, the proceedings were still pending when the present libel was filed, April 15, 1893. It further appears that, on the 14th of March, the master engaged three seamen, March 21st, a mate, and March 23d, a cook. These parties went on board the vessel, and continued in her service for about a month, but, as they did not receive their wages, they also commenced proceedings in this court to recover the several amounts due them. The libel for the seamen's wages was filed May 5, 1893. This action was not resisted by the owners, and the default of all parties was accordingly entered. While these proceedings were pending, a petition was presented to the court representing that the vessel was being detained at great cost and expense on account of marshal's fees and wharfage charges, and other expenses, and that it would be to the interest of all parties that the vessel should be sold pendente lite, and the proceeds brought into court to await the final adjudication of the cause. The bark was accordingly sold, June 23, 1893, and the proceeds paid into the registry of the court. July 11, 1893, interventions were filed for supplies furnished the crew serving on board the vessel. September 1, 1893, by consent of all parties, the claims of the seamen were paid. The present action now involves the consideration of the claims of the libelants and interveners against the balance of the proceeds remaining in the registry of the court.

The libelants and interveners claim a lien under the provisions of section 813 of the Code of Civil Procedure of this state which provides as follows:

"All steamers, vessels and boats are liable: * * * For supplies furnished in this state for their use, at the request of their respective owners, masters, agents, or consignees." "For work done or materials furnished in this state for their construction, repair, or equipment. * * * Demands for these several causes constitute liens upon all steamers, vessels, and boats, and have priority in their order herein enumerated, and have preference over all other demands."

In the recent case of The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, the supreme court had before it a question relating to the priority of a claim for supplies and necessaries furnished to a vessel in its home port, over a subsequently recorded mortgage. In considering this question, the court reviewed the authorities relating to maritime liens, and determined that, in the admiralty and maritime law of the United States, the following propositions had been established by the decisions of that court:

"For necessary repairs or supplies furnished to a vessel in a foreign port, a lien is given by the general maritime law, following the civil law, and may be enforced in admiralty." "For repairs or supplies in the home port of the vessel, no lien exists or can be enforced in admiralty, under the general law, independently of local statute." "Whenever the statute of a state gives a lien, to be enforced in rem against the vessel, for repairs or supplies in her home port, this lien, being similar to the lien arising in a

foreign port under the general law, is in the nature of a maritime lien, and therefore may be enforced in admiralty in the courts of the United States." "This lien, in the nature of a maritime lien, and to be enforced by process in the nature of admiralty process, is within the exclusive jurisdiction of the courts of the United States sitting in admiralty."

In the case at bar, the majority owners concede the right of the libelants to be paid the several amounts due them out of the fund in court, but the minority owners interpose the objection that it does not appear that the supplies or repairs furnished in this case were necessary, or that they were furnished on the credit of the vessel. It is also contended that the proceedings instituted by them on March 18, 1893, calling upon the majority owners to furnish good and sufficient security for their possession of the vessel, was notice to the world that the interests of the minority owners, at least, would not be liable for any debts that might be contracted for any supplies, repairs, or equipments furnished the vessel.

With respect to the objection that it has not been established that the supplies and repairs were necessary, and furnished on the credit of the vessel, it is to be observed that the articles and labor were furnished on the order of the master, who was a part owner, and consisted of utensils for use in the galley, materials and labor for calking and painting the vessel, and for the repair of sails, board of the crew, meat supplied for the crew on board the vessel, and for the services of a watchmaker in rating a chronometer. The testimony is to the effect that the utensils for the galley were furnished to the ship, and charged to the bark Templar; the materials for calking and painting were "sold to the ship," and charged to the bark Templar and owners; the bill for labor in calking was "charged to the bark Templar;" for the repairs of the sails, "credit was given to the ship and owners," and charged to the bark Templar and owners; the board of the crew was "charged to the bark Templar;" and the bill for meat was charged to the bark Templar and owners. To whom credit was given for rating the chronometer does not appear. All the charges appear to be reasonable, with one exception, to be noticed hereafter, and the character of the supplies and labor indicate that they were necessary for the vessel. The minority owners contend, however, that, as these supplies and labor were furnished at the home port of the vessel, this evidence is not sufficient; that the libelants and interveners must not only prove a necessity for the supplies and labor, but they must also prove that there was a necessity, at the time, to resort to the credit of the vessel to obtain such supplies and labor.

In the case of The J. E. Rumbell, supra, the same objection was made as in the present case. Although the question certified to the supreme court by the circuit court of appeals did not directly involve a consideration of the objection, nevertheless, it was assumed by the court, for the purpose of deciding the question of priority, that all the claims for supplies and repairs were contracted under such circumstances that a lien upon the vessel for their payment existed under the statute of Illinois, and should be enforced in admiralty by the courts of the United States against

the proceeds of the vessel, unless the mortgagees were entitled to a priority in the distribution; and it was accordingly held that the lien for necessary supplies and repairs did take precedence of a prior mortgage. The statute of this state provides that for services rendered on board of a vessel, or for supplies furnished, in this state, at the request of the master, owner, agent, or consignee, a lien is created upon the vessel, and, for work done or materials furnished in this state for the construction, repair, or equipment of a vessel, a lien is created without such request. These provisions do not, however, relieve such transactions from the limitations on the master's authority, as established by the maritime law. Thomas v. Osborn, 19 How. 30; Pratt v. Reed, Id. 359; The Grapeshot, 9 Wall. 129; The Young Mechanic, 2 Curt. 404; The Lady Franklin, 1 Biss. 557; The Guiding Star, 18 Fed. 263; The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396; S. H. Harmon Lumber Co. v. Lighters Nos. 27 and 28, 57 Fed. 664. The question remains as to what presumptions arise where the master, representing a majority of the part owners, contracts for supplies at the home port on the credit of the vessel.

In the case of The Grapeshot, supra, the supreme court held that—

"Where proof is made of necessity for the repairs or supplies, or for funds raised to pay for them by the master, and of credit given the ship, a presumption will arise, conclusive, in the absence of evidence to the contrary, of necessity for credit." "Necessity for repairs and supplies is proved where such circumstances of exigency are shown as would induce a prudent owner, if present, to order them, or to provide funds for the cost of them on the security of the ship." "The ordering, by the master, of supplies and repairs on the credit of the ship, is sufficient proof of such necessity to support an implied hypothecation in favor of the material man, or of the ordinary lender of money to meet the wants of the ship, who acts in good faith."

The question at issue in this case, however, was as to the lien of a bottomry bond executed in a foreign port by the master of the vessel for repayment of advances to supply the necessities of the ship, and it may be said that the case is not authority beyond that question.

In Crawford v. Roberts, 50 Cal. 235–241, the supreme court of this state held that—

"The master's power is presumed, in the absence of evidence to the contrary, to extend to making contracts for supplies in the home port, which shall bind the owners. Provost v. Patchin, 9 N. Y. 239, and cases there cited. Whatever the doctrine of the maritime law, by the analogies of the common law, the duties and relations of the master furnish presumptive evidence of his authority to purchase supplies."

In applying the rules of the maritime law, establishing a lien for repairs or supplies furnished in a foreign port, to the lien created by the statute of the state for repairs or supplies furnished to a vessel in her home port, the supreme court, in The J. E. Rumbell, supra, recognizes no difference in principle, and accords to the latter the same precedence that is accorded to the former. In commenting on the character of these two liens the court says:

"Each rests upon the furnishing of supplies to the ship on the credit of the ship herself, to preserve her existence and secure her usefulness, for the benefit

of all having any title or interest in her. Each creates a jus in re,—a right of property in the vessel,—existing independently of possession, and arising as soon as the contract is made, and before the institution of judicial proceedings to enforce it. The contract in each case is maritime, and the lien which the law gives to secure it is maritime in its nature, and is enforced in admiralty by reason of its maritime nature only."

It would seem to follow that if these liens are of the same maritime character, subject to the same limitations, and enforced by the same rules of procedure, the same presumptions must arise in favor of the master's authority to contract on the credit of the vessel for necessary supplies and repairs, and the same rule would obtain with respect to the authority of part owners. The Two Marys, 10 Fed. 923.

In the case at bar the claims are not based upon running accounts. The bark had not been to sea for nearly a year, and it does not appear that the libelants or interveners had given the owners alone any previous credit, or that they did so on this occasion. In these particulars the case differs from at least two of the cases cited where the lien was denied. Without evidence to the contrary, and upon the facts established in support of these claims, it seems to me that there is a presumption that such articles and labor as were furnished by the libelants and interveners in this case were necessary to fit the vessel for a voyage, and that it was necessary that the articles and labor should be obtained on the credit of the vessel. It may be further observed that the libel of Cornwell and Boole in the suit for possession distinctly alleged that considerable repairs were necessary, and that the bark was unfit to perform any voyage without such repairs. It is true, the libel did not specify what repairs were necessary; but the libelants in that case are the parties who now object to the payment of these bills, and they have not shown, as they might have done if it were true, that their allegations had reference to other and different repairs and supplies.

But it is urged that the possessory suit was notice to all the world that the control of the vessel was in controversy, and that the master's authority to contract on the credit of the vessel was at an end. There are two answers to this proposition: First. The libel for possession was filed, as before stated, March 18, 1893. Benson took charge of the vessel March 14, 1893, and before March 18th he had contracted for at least part of the supplies, and engaged labor to make some, if not all, repairs. Second. The complaint in the libel for possession was that the vessel was about to enter upon a voyage; that she was in need of repairs, and libelants believed that, upon such voyage, the bark would be condemned as unseaworthy, and excessive charges for repairs be imposed on libelants. It will be noted that the complaint was not that the vessel was being repaired, or about to be repaired, and furnished with supplies, in this port, nor was it objected that she was incurring, or about to incur, charges for which liens would attach. Moreover, the prayer of the libel was that the other part owners should show cause why Benson should not be restrained from proceeding to sea with the bark until good and sufficient security should be given, to the

amount of the value of the share of the libelants, for the return of the vessel to San Francisco. There was certainly nothing in the allegations of this libel to put the material men on notice that the master had no authority to contract, on the credit of the vessel, for reasonable repairs and supplies in this port.

There is, besides, another element in this case to be considered. This is not a controversy between creditors over remnants in the registry in the court. There are sufficient funds in the registry to pay these debts, and leave a small balance to the owners. If I am mistaken as to the presumptions that arise in favor of the libelants and interveners as to the necessity for the supplies and repairs, and that they were furnished on the credit of the vessel, I am certainly not mistaken as to the power of the court to entertain these claims as against the proceeds in the registry of the court. Schuchardt v. Babbidge, 19 How. 239; The Lottawanna, 21 Wall. 558; The Guiding Star, 18 Fed. 263; The E. V. Mundy, 22 Fed. 173; The Island City, 1 Low. 375. In the latter case, Judge Lowell declares the power of the court over the proceeds in the registry in the following language:

"When a ship has been sold, the admiralty court has jurisdiction to distribute the proceeds. The Angelique, 19 How. 239. It is not a question of admiralty jurisdiction, but of the power of the court to deal justly with a fund in its registry. On the day this case was argued, I ordered the moiety of a fine which had been recovered by indictment in the name of the United States to be paid to the informer. I had no jurisdiction, nor had any other court, of a suit by the informer against the United States; but I had the jurisdiction which all courts have to deal with funds in the registry according to the rights of those whose property has been converted into money by the order of the court, or who have, for any other reason, a lawful interest in the fund."

Under these authorities, it is clear that the libelants and interveners are entitled to have the equities of their claims recognized, and, as against only the objection of the minority owners of the vessel, they should be paid out of the proceeds in the registry of the court. The claims of the libelants and interveners will therefore be allowed and paid, as follows: W. S. Ray & Co. Manufacturing Company, galley utensils, $48.23; Pacific Marine Supply Company, materials for calking and painting, $73.47; J. H. Farnham & Co., labor, materials, and cartage, etc., for calking, $351.37; A. Anderson, boarding crew, $36; Witzman & Staiger, meat supplied to crew, $51.60.

The testimony relating to the bill of E. E. Hitch, for repairing sails, $363.08, is to the effect that the repairs, to the extent that it is claimed that they were made, were unnecessary, and the charges unreasonable. It appears that the repairs were reasonably worth $75. The claim will therefore be allowed for that sum. The claim of Dillon & Co. for rating chronometer, assigned to M. W. Bode for collection, is not supported by sufficient evidence, and it is rejected. The claim of the board of state harbor commissioners, for $438.30, for wharfage incurred while the vessel was in the custody of the marshal, will be paid, as an expense of the marshal, for the sum of $316.10. A decree will be entered accordingly.