## DAVIDSON et al. v. BALDWIN.

(Circuit Court of Appeals, Sixth Circuit. March 2, 1897.)

No. 433.

1. SHIPPING — MORTGAGEE HOLDING LEGAL TITLE — PERSONAL LIABILITY FOR REPAIRS.

One who purchases a vessel at marshal's sale, takes the legal title, and is registered as owner at the customhouse, but who, in fact, purchases for another, and holds the title merely as collateral security for a debt, is a mere mortgagee; and if he is not in possession, and does not appoint the master, he is not personally liable for repairs or supplies furnished on the order of the master. And when it is sought to hold him liable he is not estopped from showing his true relation to the vessel.

2. SAME — APPOINTMENT AND AUTHORITY OF MASTER — ENROLLMENT.

When one is acting as master by appointment of the real owner, his status and authority as such are not affected by the fact that his name has not been inserted as master in the enrollment, for the registry and enrollment are only for the protection of the revenue.

3. SAME — ESTOPPEL.

B. was the registered owner of a vessel, but in fact held the legal title as security for a debt. R. & Sons were the real owners, and R. was enrolled as master, and had full possession and control. Without changing this enrollment, he appointed one M. as master, himself doing the business of the vessel, as managing partner of R. & Sons. As such, he ordered repairs of libelants, they understanding that he did so simply as "manager." *Held*, that on these facts, in the absence of any other evidence of a holding out by B. of R., as his manager, B. was not estopped from denying that R. was his agent.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

The record includes three libels in personam, filed by persons doing repairs or furnishing material to the tug Sea Gull, for which it is sought to make the appellee, Stephen Baldwin, liable as owner. These libelants were James Davidson, the Bay City Iron Company, and Charles and William F. Jennison. The record also includes a libel filed by James Murdock, who seeks to recover his wages as master of the Sea Gull. All of these libels were by agreement consolidated and heard together. The facts necessary to be stated, as we find them to be, are these: The tug Sea Gull was originally owned by the Reid Towing & Wrecking Company, a corporation of the state of Michigan, of which

one-half the capital was owned by James Reid, who was the president and manager of the corporation. Under proceeding against the tug in the district court, the Sea Gull was sold at marshal's sale to satisfy sundry decrees of that court. At the sale she was bought by the appellee, Stephen Baldwin, at the price of $14,000, and a bill of sale executed to him. This purchase was made by Baldwin for James Reid, under an agreement by which he was to advance to Reid $12,500 of the purchase money, and take and hold the legal title until Reid's note for that sum should be paid, and another note for $1,000, due Baldwin upon another transaction. Baldwin paid $12,500 of the price bid at marshal's sale, the remainder of the purchase money being paid by Reid or by another for him. Reid gave to Baldwin the note of James Reid & Sons, a firm composed of himself and two sons, formed for the purpose of carrying on the business originally carried on by the Reid Towing & Wrecking Company, for the sum thus loaned, which the latter indorsed to a bank as a means of raising money thereon. Baldwin gave to Reid an obligation to convey the vessel to him upon payment of that note, and another for $1,000, made by James Reid alone. That paper was in these words:

"I hereby agree to transfer the tug Sea Gull, all her equipage, all booms, boom chains, pumps, and anything else that I may now have or hereafter come into my possession, upon the payment of two notes held by me. Twelve thousand five hundred dollars is now held by the Preston National Bank, and indorsed by me. This note to be paid by James Reid & Sons, or by James Reid. One of twelve thousand five hundred ($12,500) dollars, made by James Reid & Sons, and one for one thousand ($1,000), made by James Reid. Also the interest on said notes, and any other obligation that may be incurred by James Reid that I may become responsible for. Also sufficient to pay me for any trouble that I may be to.

"[Signed]                                              S. Baldwin. [L. S.]"

The tug was enrolled and registered in the name of Stephen Baldwin as owner, "whereof James Reid was at present master." This enrollment was at Detroit, the place of the residence of said Baldwin. The tug, from the time she was turned over by the marshal, remained in the sole possession of James Reid or James Reid & Sons, and was by them used in connection with two other tugs, owned in whole or part by Reid, in a wrecking and towing business carried on by the firm of James Reid & Sons. The bill of sale to Baldwin and the registry bear date in May, 1891. During most of the season of 1891, Reid himself sailed the Sea Gull; but late in 1891 he hired the appellant James Murdock to sail her, and from then until her destruction by fire, in 1893, Murdock was the acting master, and it is for his wages as master that he has filed his libel. From some time in 1891 (time not ascertainable) Reid was the managing partner of James Reid & Sons, a firm whose place of business was at Bay City, Mich. The business he conducted as "James Reid & Sons," and under this title he managed each of the tugs owned or controlled by James Reid & Sons, and under that style kept his bank account, and bought supplies for his wrecking business and for the tugs, and under the same designation ordered the repairs for the Sea Gull for which the libelants below preferred their several claims. In each instance these supplies and repairs were charged to the Sea Gull, as other supplies or repairs were charged by them to the particular tug to which they were furnished. Under the same designation, Murdock was hired to sail the Sea Gull. Baldwin was not engaged in any sort of maritime business, and was a capitalist. He had nothing whatever to do with the Sea Gull, was never in possession, had no interest in her earnings, and knew nothing of her employment or situation. He gave Reid no employment or authority to act for him, or in any way charge him for supplies or repairs, and was never consulted about the repairs now sued for by either Reid or any of appellants. He knew nothing of Murdock's employment as master. When he entered upon this agreement to aid Reid in buying the Sea Gull, the latter agreed to keep her insured, and did take out insurance to the extent of about $27,000 in Baldwin's name as owner. Baldwin was ignorant of the fact of such insurance until after the loss of the boat by fire. Upon being apprised of the loss and insurance, he made regular proof of loss, and has collected the greater part of the insurance money. Judge Swan, of the district court, dismissed the several libels, and appeals have been perfected and errors assigned.

F. H. Canfield, for appellants.

T. E. Tarsney and W. W. Wicker, for appellee.

Before TAFT and LURTON, Circuit Judges, and SAGE, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

Under general maritime law, there would be no lien upon the ship for repairs made on order of her master at a home port. The General Smith, 4 Wheat. 443; The Lottawanna, 21 Wall. 559; The Edith, 94 U. S. 518; The Samuel Marshall, 6 C. S. App. 389, 4 C. C. A. 385, and 54 Fed. 396. The repairs made which constitute the basis for the claims here asserted were made at Bay City, a port within the state of the residence of Baldwin, the person sought to be made liable as owner. Bay City was therefore a home, and not a foreign port, whether Baldwin or Reid be treated as owner. The Samuel Marshall, supra. If any lien was fastened upon the Sea Gull to secure the debt for repairs, it would arise alone upon the statute law of Michigan, and then only if the repairs were made upon the credit of the vessel. The Samuel Marshall, supra. The J. E. Rumbell, 148 U. S. 1–19, 13 Sup. Ct. 498. As the Sea Gull was totally destroyed before any libel, it is unimportant to consider whether or not any lien was acquired under the local law, for a lien on the res, dependent alone on local law, would not make the owner liable in personam, unless he would be so upon general principles of law. The evidence makes it clear that the real relation which existed between Reid and Baldwin was that of mortgagor and mortgagee. Baldwin held the legal title as mere collateral security for the payment of debt, and upon payment was obligated to convey the Sea Gull to Reid. That it is competent to show by parol evidence that, although Baldwin had the title, he was, nevertheless, only a mortgagee, is well settled. That the tug was registered in his name does not prevent proof of the real relation. Morgan's Assignees v. Shinn, 15 Wall. 105; Winslow v. Tarbox, 18 Me. 132; Philips v. Ledley, 1 Wash. C. C. 226, Fed. Cas. No. 11,096; Howard v. Odell, 1 Allen, 85; Mitcheson v. Oliver, 5 El. & Bl. 419. Baldwin, as mortgagee, never had actual control of the vessel, never had possession, and was in no way interested in her earnings. That a mortgagee who holds the legal title, but who is not in possession, is not liable personally for supplies and repairs furnished the ship upon order of the mortgagor or master, is now well settled. Winslow v. Tarbox, supra; Howard v. Odell, supra; Philips v. Ledley, supra; 3 Kent, Comm. 134; McIntyre v. Scott, 8 Johns. 160.

But appellants claim that the evidence shows that Reid told some of them that Baldwin had purchased the vessel at the marshal's sale, and led them to believe that he was the owner; that they all knew that Baldwin appeared on the customs' registry as the owner, and Reid as the master; and that none of them knew that Baldwin only held the title as collateral security, or knew of the obligation to convey to Reid when his debt was paid. In support of this position, counsel for appellants rely upon Story, Ag. § 298, where it is said:

79 F.—7

"It will make no difference in respect to the liability of the owner, in case of repairs to ships, that by private agreement or charter party, between the owner and master, the latter is to have the entire ship to his own use for a specified period, and is to make all the repairs at his own expense, for such a private agreement cannot vary the rights of third persons."

This text is supported by the well-known case of Rich v. Coe, Cowp. 636. But the case cited and the doctrine stated apply only where the person sought to be made liable is the real owner, and the person ordering the repairs was the master appointed by the owner. In such case the existence of a secret agreement by which the master was to sail the ship on his private account, and himself keep her in repair, would not affect the rights of third persons ignorant of the charter party, and guilty of no negligence. This is the rule applied in the case of The Samuel Marshall, 6 U. S. App. 389, 4 C. C. A. 385, and 54 Fed. 396. The rule stated by Judge Story has its foundation in the liability of the owner for the engagements of the master within the well-defined limits of the authority implied from the office of master. But the real question in all such cases is, who is the contracting owner made liable by the master's conduct within the well-defined scope of a master's implied authority? The mortgagor, although he holds the title, and appears in the registry as the owner, is, if out of possession, not the owner whom the master is authorized by law to bind for repairs made on his order. Whatever doubt may have been entertained at one time, it is now well settled that a mortgagee out of possession is not the owner made liable by repairs made on order of the mortgagor or the master. 3 Kent, Comm. pp. 133, 134. Neither is the case altered because the mortgagee holds the legal title under a bill of sale absolute on its face, and stands upon the registry as the owner. The latter circumstance does not change the real relation of the mortgagee, and does not by itself estop him from showing that he was not the owner when sought to be made liable for repairs. The owner who is made liable by the master's act is the owner whose agent he is, and from whom he derived his authority.

The books contain many cases in which there concurred the facts here relied upon to estop the defendant from denying his liability. Thus, in the case of Mitcheson v. Oliver, 5 El. & Bl. 419, the action was for repairs, and work done, and materials furnished to fit out the ship Progress on order of one who appeared on the registry as her master. The defendant appeared on the same registry as owner. But the defendant showed in defense that he had agreed to sell the Progress to one G., by a contract in writing, unregistered and unknown to the plaintiffs, and that the master had actually been appointed by G., though circumstances, including the enrollment, led plaintiffs to suppose him to have been appointed by O. A verdict in favor of plaintiffs was set aside by the court of queen's bench, upon the ground that there had been a misdirection, and that the jury had come to a wrong conclusion, and that the verdict ought to have been for the defendant. Park, B., among other things, said:

"None of us, I believe, have doubted that the jury came to the wrong conclusion, and that the verdict ought to have been for the defendant, on this single ground that no contracts can bind a defendant unless made by some

one who had real authority to bind him, or unless the defendant is precluded from denying that there was authority in the person who made the contract. It is perfectly settled now that the liability to pay for supplies to a ship depends upon the contract to pay for them, and not on the ownership of the ship. We are all satisfied that, on this evidence, the jury ought not to have found Thomson really agent for the defendant in making this contract, nor that the defendant held out false colors, representing that Thomson had authority to bind him, when in point of fact he had not, so as to induce the plaintiffs to believe that he could make the contract for the defendant, and that the plaintiffs acted in the supply on that belief."

Touching the summing up of the trial judge, the court said:

"Lord Campbell told the jury that 'the defendant would not be liable to the plaintiffs' demand, merely as owner of the ship, nor by reason of this being registered as such owner; nor would he be liable merely by the orders being given to the plaintiffs by the registered master of the ship,' and so far the direction is perfectly accurate; but then comes an enumeration of the circumstances under which the defendant 'might be liable,' which must be understood as meaning that, if the jury found that these circumstances all existed, they should find for the plaintiffs. We think that this enumeration is defective. The circumstances enumerated are: If the defendant 'remained in possession of the ship, and held himself out as owner, and if a person acted as master of the ship with his privity and consent, and the goods and work were supplied to and done upon the ship upon the credit of the owner, by the bona fide orders of the master, given with the privity of the owner, and if the goods and work were fit, necessary, and proper for the ship, under the circumstances in which she was placed, and fit and necessary for the purposes of the ship, at the time of the orders.' Now, we think that, though all these circumstances existed, yet it would not be enough to render the defendant liable, unless the person acted as the defendant's master of the ship with his privity and consent, and the goods and work were supplied to and done upon the ship, not merely 'upon the credit of the owner, by the bona fide orders of the master given with the privity of the owner,' but as on a contract with the owner on orders given by the master as for him. Now, in this case, on the evidence, it appears that the defendant did not, by word or deed, in any way hold out Thomson as his master; and therefore the defect in this part of the summing up is material, and would influence the verdict."

The mere fact that one stands on the registry as the owner by no means determines that he is the contracting owner made liable through the agency of the master. 3 Kent, Comm. pp. 133, 134.

In Howard v. Odell, 1 Allen, 85, the facts were these: The ship was registered as owned by Odell & Kidder. The plaintiff sold supplies for the ship to Odell. Upon inquiry made when the first bill was made, Odell said that the ship was owned by Odell & Kidder. Afterwards plaintiff sent to the customhouse, and found her so registered. The charge was made to the ship. The fact was that Kidder held a bill of sale absolute on its face for one-half of her from one Wilson, which was duly recorded. But it was shown that in fact Kidder only held this title as collateral security for the payment of a debt due him from Wilson, and never exercised any acts of ownership over her, nor authorized Odell to in any way incur liability for him. Upon the facts, it was sought to hold Kidder personally liable for repairs and supplies ordered by Odell. The court held Kidder not liable. Bigelow, C. J., delivering the opinion of the court, after saying that it was settled that the mortgagee of a vessel not having her in his possession or control was not liable for supplies or repairs furnished on the order of the master or mortgagor, said:

"Nor does the fact that the register or enrollment of the vessel stands in the name of the mortgagee, and that his apparent title on the record is by a conveyance absolute in form, of itself operate to render him liable for debts contracted for supplies and repairs. The real question in all such cases is: With whom was the contract made, and was the person who made it authorized to bind the mortgagee? If the mortgagee was not in possession of the vessel, and did not receive the benefit of her earnings, or exercise any control over her, but only held his title as collateral security for his debt, then it is very clear that neither the master nor the mortgagor could claim to act as his agent, or bind him by their contracts. In such case there is no authority, either express or implied, by which they can undertake to act in his behalf. Doubtless the mortgagee may, by his acts, hold himself out as the real owner of the vessel in such a way as to lead persons to believe that the master or mortgagor is his agent, authorized to make contracts concerning the vessel. He would then be bound by them, under the ordinary rule of law regulating the relation of principal and agent. * * * Indeed it would be giving altogether too much weight to the registry and enrollment of vessels to hold that persons whose names appeared therein as owners were thereby made liable for repairs and supplies. Every one conversant with shipping and commercial dealings knows that vessels are often employed under charter parties, by which even the real owners are exempted from all charges incurred in their management and navigation. Whenever the charterer is, by the terms of his contract, deemed to be owner pro hac vice, no liability for supplies or repairs attaches to the actual owner of the vessel in whom the legal title is vested. It is therefore well understood among all persons engaged in the business of making repairs or furnishing supplies that their right to recover payment therefor does not depend on the registry or enrollment, but on the right and authority of the person with whom they deal to act as agent for the owners, and to bind them by his contracts. The real transaction between the parties is to be looked at, in order to ascertain whether that which appears by the registry to be a legal title in a particular person is or is not such an ownership as will authorize the person making the contract to act as agent. An equitable title in one person, having the control and possession of the vessel, may well consist with a documentary title at the customhouse in another person." Philips v. Ledley. 1 Wash. C. C. 226, Fed. Cas. No. 11,096; Winslow v. Tarbox, 18 Me. 132; Duff v. Bayard, 4 Watts & S. 240; McIntyre v. Scott, 8 Johns. 159; Wendover v. Hogeboom, 7 Johns. 308.

In the case before us, it turns out that, though Reid stood on the enrollment as the master, he was not acting as master when these repairs were ordered. James Murdock was actually the master controlling the navigation of the Sea Gull, and was appointed to that place by Reid. That Murdock was acting as master was known to appellants. That his name had not been inserted in the license does not affect his actual status as master, for the registry and enrollment statutes are only for the protection of the revenue, and failure to have his name inserted as master would not affect Murdock's actual authority as master. The Boston, 1 Blatchf. & H. 309, Fed. Cas. No. 1,669; Steamboat Co. v. Scudder, 2 Black, 385. If one holds and exercises the position of master of a ship, the position at once gives him authority, and at the same time defines it. But here appellants cannot rely upon the implied authority of Reid as a master, because he was not in fact master, and was not at the time these repairs were made acting as master. These repairs were ordered by him in the character, as libelants understood, of "manager." Now, this is an agency unknown in general maritime law, and the authority implied from such a position is in that law undefined. There is evidence in the record that there is a custom on the lakes for lines of boats to be placed under the general direction

of an officer representing the owner, called a "manager," and that such managers contract for supplies, repairs, etc. It is also shown, though the matter would be evident without proof, that the principals represented by such manager are sometimes mere charterers of vessels. That, at last, would only bring us back to the point from which we started, namely, that the persons bound by the acts of such an agent would be those appointing him to the place. Now, there is not the slightest doubt of the fact that Baldwin never did appoint Reid to the place of "manager." Neither did Reid represent himself as managing for Baldwin. The clearly-established facts are that James Reid and his sons were partners, under the firm name of Reid & Sons, and under this firm name were engaged in wrecking and towing. In this business they employed two tugs, the Sea Gull and the Parker, and sometimes a third, the Manistique. Of this business James Reid was manager. The appellants have chosen to regard him as manager of the Sea Gull for Baldwin, who they understood was her owner. Now, there are three ways in which a person can be bound on a contract: First, when he himself has made it; second, when an agent really authorized to bind him has made the contract for him as principal. There is no evidence to support a liability based upon either of these grounds. The third and last method by which one may be bound is where a person has made a contract for him as principal, not really having authority to do so, but that the conduct of the supposed principal has been such as to preclude him from denying that there was authority.

This brings the case down to this question: What did Baldwin do which amounted to such a holding out of Reid as his manager as that he should now be precluded from denying that he was his agent in fact? The facts that he held a bill of sale absolute on its face, and that the vessel stood on the registry in his name as owner, were not of themselves such a holding out of himself as owner and Reid as his master as to preclude him from showing that he was not the owner, and that Reid was not his master; yet there is much more color for claiming that he ought to be estopped from denying that he was the real owner, and Reid his master, than there is for precluding him from denying that Reid was his "manager." The circumstance that in the enrollment he had stated that Reid was then the master might plausibly lead one to suppose him to be his master, and preclude him from denying liability within the well-defined limits of a master's office for his acts as master. But at the time Reid was doing business as "Reid, Manager," he was no longer exercising the authority of master of the Sea Gull. Another was in that situation, and exercising its authority. It is very clear that something more must be shown than that the title and registration stand in his name in order to preclude him from denying that Reid was his manager. No one pretends that Baldwin, by any affirmative act or word, held him out as managing the Sea Gull for him. Reid himself made no such representation. There was nothing in the circumstances, other than the condition of the legal title and the enrollment, calculated to lead libelants into believing that Reid was "managing" the Sea Gull for Baldwin. The general busi-

ness conducted by Reid, and his employment therein of other vessels known not to belong to Baldwin, were calculated to make them believe that Reid was managing the Sea Gull, as he was the other tugs, for himself and those connected with him in the business of Reid & Sons. It is indeed difficult, on the evidence in this case, to believe that libelants supposed that they were extending credit to Baldwin, and that he was the person with whom they were dealing as the contracting owner. If it is sought to charge Baldwin with a contract for him as principal, made through one not really having authority to bind him, it is absolutely essential to show two things: First, that libelants at the time supposed him to be the contracting person or one of the contracting persons; and, second, that the conduct of the supposed contracting principal has been such as to preclude him from denying that there was authority. Now, the evidence falls far short of what is necessary in respect to both divisions of the question. To say that credit was given to the Sea Gull, or that credit was given to the vessel and her owner, or that credit was given to Baldwin, is quite unsatisfactory. In the case of The Samuel Marshall, heretofore cited, where the question was as to whether certain supplies had been furnished upon the credit of the vessel, this court, speaking through Judge Taft, said:

"The fact that the supplies were charged against the vessel on the books of the libelants is evidence only of a self-serving practice which has no particular weight in the determination of this question." 6 U. S. App. 401, 4 C. C. A. 392, and 54 Fed. 403.

The evidence in this case shows that such a charge was habitual without regard to the circumstances. So, the statement that credit was given to Baldwin is even less satisfactory, for no corresponding charge was made, and no statement was made by either party indicating that such credit was asked or given. Indeed, the practice of saying to juries, in cases where it is sought to charge one other than the person actually procuring the supplies or repairs, that the question is, "To whom was the credit given?" has been most pointedly condemned as misleading.

In Mitcheson v. Oliver, 5 El. & Bl. 419–437, where the question was whether the ostensible owner of the vessel was bound by repairs made on order of the master, Park, B., said in regard to the liability of Oliver, the defendant sued as contracting owner:

"Supposing that Oliver had said or done something inconsistent with the true facts, which does not appear to be the case, still it would not bind him unless the plaintiff supplied the goods on the faith that Oliver was the contracting person. I purposely avoid saying 'on Oliver's credit,' a phrase which I wish were never used, as it constantly misleads juries into thinking that something short of being the contracting party will make a person liable."

Upon the other branch of the evidence necessary to make out a case which should preclude the appellee from denying Reid's authority, appellants have failed more signally. That Reid took out insurance upon the Sea Gull in Baldwin's name is of no significance upon this question of false colors held out by Baldwin, for the reason that this insurance was not procured until after the repairs were made. As evidence of an agency in fact, it has some weight, but could not have been a misleading circumstance inducing them

to believe that Reid was managing for appellee. That insurance was procured by Reid for his own benefit. It is true that Baldwin was collaterally interested, but that is wholly due to his creditor relation. That it was taken out in his name, and that he has collected it, is due to the situation of the title. Baldwin's ratification of Reid's act in taking this insurance in his name cannot help appellants in any view of the case. The subsequent ratification of an originally unauthorized act operates as a previous authority only as between the parties to the contract ratified. But, were it otherwise, an authority by a mortgagee to the mortgagor to take insurance in the mortgagee's name would not include an authority to bind the mortgagee for extensive repairs upon the property to be insured, even though without such repairs the vessel was uninsurable. The agency for such a purpose would not bring within its scope so foreign a matter as repairing the subject-matter of insurance.

The libel of James Murdock stands upon even less firm ground than those of his co-appellants. The decree dismissing all of the libels must be affirmed, with costs.